# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-139V**
**Filed: August 10, 2026**

| | |
|---|---|
| ROSS McCAMMON,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Sean Franks Greenwood, The Greenwood Law Firm, Houston, TX, for petitioner.*
*Mary Novakovic, U.S. Department of Justice, Washington, DC, for respondent.*

## **DECISION**[1]

On January 6, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act, 24 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a left-sided Shoulder Injury Related to Vaccine Administration ("SIRVA") or a shoulder injury caused-in-fact by vaccination following receipt of an influenza ("flu") vaccination on October 31, 2019. (ECF No. 1, p. 1; *see also* ECF No. 16 (amended petition).)

For the reasons set forth below, I conclude petitioner received the vaccination at issue in the shoulder opposite his alleged injury. This finding is dispositive, and the case is therefore dismissed.

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of administration of a flu vaccine. § 300aa-14(a) as amended by 42 C.F.R. § 100.3. Table Injury cases are guided by a statutory "Qualifications and aids to interpretation" ("QAI"), § 300aa-14(b), which provides more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table, § 300aa-14(a). To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). To successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II. Procedural History

Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases having a likelihood of informal resolution. (ECF No. 12-13.) In this

case, however, after petitioner had completed the evidentiary record,[3] respondent filed a Rule 4 Report recommending that compensation be denied. (ECF No. 31.)

Thereafter, the Chief Special Master issued an Order to Show Cause why the case should not be dismissed. (ECF No. 32.) Specifically, the Chief Special Master advised that "[t]he record as it currently stands does not preponderantly support Petitioner's assertions related to [injection] situs and [shoulder] pain onset – and he must rectify this evidentiary omission to avoid a dismissal of his claim." (*Id*. at 8.)

In response to the show cause order, petitioner filed two pieces of medical literature (Exhibits 7-8)[4] along with additional written statements by himself and his fact witness (Exhibits 9-10).[5] Petitioner also filed a brief arguing that, "[w]ith the available evidence, Petitioner's claim for an on-table SIRVA injury must prevail and the Chief Special Master should rule in favor of Petitioner as being entitled to compensation." (ECF No. 35, p. 14.) However, petitioner also added that "[w]ere the Special Master to opine that Petitioner is not entitled to compensation, the Petitioner requests a live hearing before the Special Master." (*Id*. at 15.)

Based on these filings, the Chief Special Master reassigned the case to the undersigned for further litigation. (ECF No. 36.) Specifically, the Chief Special Master noted petitioner's request for a live hearing and also indicated "the need for additional evidence, especially related to situs." (*Id*.)

After the case was reassigned, I issued a Scheduling Order (Non-PDF) as follows:

> After review of petitioner's response to his order to show cause, the Chief Special Master reassigned this case for further development of the record, particularly as to the issues of injection situs and onset. Petitioner shall file, by no later than 3/26/2026, a joint status report on behalf of the parties indicating how the parties propose to proceed.

In response to this order, petitioner filed a joint status report on behalf of the parties advising that "[t]he parties intend to continue the case and request the Special

---

[3] Specifically, petitioner filed an affidavit marked as Exhibit 1, medical records marked as Exhibits 2-5, and an additional witness statement. The witness statement is not marked with an exhibit designation; however, based on the designations used for subsequent exhibits, it appears petitioner intended this exhibit to be marked as Exhibit 6 and it will be cited as such throughout this decision.

[4] I have reviewed these articles; however, they are not relevant to the factual question of injection situs. (Chelsey T. Wood et al*., Shoulder Injury Related to Vaccine Administration: Diagnosis and Management*, 4 J. HAND SURGERY GLOBAL ONLINE 111 (2022) (Ex. 7); Ashley Bancsi et al., *Shoulder Injury Related to Vaccine Administration and Other Injection Site Events*, 65 CANADIAN FAM. PHYSICIAN 40 (2019) (Ex. 8).) And, indeed, petitioner cited these papers in his show cause response for a different point. (ECF No. 35, pp. 13-14.)

[5] Whereas petitioner's initial affidavit at Exhibit 1 was notarized, none of the other three written statements that have been filed were notarized.

Master proceed with making a decision on Chief Special Master Corcoran's July 31, 2024, *Order to Show Cause* and Petitioner's related *Response* of September 17, 2024." (ECF No. 38 (footnotes omitted).)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to resolve the issue(s) presented by the order to show cause on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020). Accordingly, this matter is now ripe for resolution.

## III. Summary of Record Evidence

### a. Medical Records[6]

During a routine physical on October 31, 2019, petitioner (a 63-year-old police officer) was noted to be suffering from type 2 diabetes with nephropathy,[7] combined hyperlipidemia associated with type 2 diabetes mellitus, hypertension, chronic hepatitis C, sleep apnea, and malignant neoplasm[8] of the prostate. (Ex. 3, pp. 290, 292.) Under the musculoskeletal portion of the physical examination, it was noted that petitioner exhibited normal range of motion ("ROM") and no "edema, tenderness or deformity." (*Id*. at 295.) The primary care provider ("PCP") ordered testing and a flu vaccine, and petitioner was referred for a sleep study and to an ear, nose, and throat ("ENT") specialist for "intermittent vertigo." (*Id.* at 295-96.)

The vaccine record indicates that Petitioner received the flu vaccine intramuscularly in his right deltoid:

**10/31/2019 - Office Visit in Clear Lake Family Medicine (continued)**

**Immunizations Given**

Immunizations last reviewed by Sklenarik, Rebecah, CMA I on 10/31/2019 1226

**Influenza Virus Vaccine, age 6 months and up** *[last edited by Sklenarik, Rebecah, CMA I on 10/31/2019 1226]*

| | | |
|---|---|---|
| Administered by: Sklenarik, Rebecah, CMA I | Administered on: 10/31/2019 1224 | Dose: 0.5 mL |
| Site: Right deltoid | Route: Intramuscular | NDC: 49281-0631-78 |
| CVX code: 158 | VIS date: 8/15/2019 | |
| Product: FLUZONE QUADRIVALENT | Manufacturer: Sanofi Pasteur | Lot number: UJ254AC |
| Expiration date: 6/30/2020 | | |

**Questionnaire**

| Question | Answer |
|---|---|
| Patient screened and no contraindications found? | Yes |
| VIS Given to: | PATIENT |

---

[6] Because petitioner did not file any additional medical records subsequent to issuance of the Chief Special Master's Order to Show Cause, the factual summary contained in that order is carried over to the instant decision. However, I have independently reviewed all of the medical records filed in this case.

[7] Nephropathy is "any disease of the kidneys." *Nephropathy*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=33527 (last visited Aug. 3, 2026).

[8] Neoplasm is "any new and abnormal growth." *Neoplasm*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=33438 (last visited Aug. 3, 2026).

(Ex. 3, p. 322; *see also* Ex. 2 (separately filed vaccine record).)[9]

Approximately one week later, petitioner was seen for his sleep assessment. (Ex. 3, p. 324.) The record from this visit lists "[s]ymptoms of snoring, sleepiness, [and] disturbed sleep." (*Id.* at 326.) Later, on January 6, 2020, petitioner underwent a sleep study. (*Id.* at 324-43.) There is no mention of left shoulder pain in either record. (*Id.* at 324-43.) Petitioner was diagnosed with sleep apnea and advised to lose weight and follow-up in twelve weeks. (*Id.* at 343.) Petitioner also underwent an eye examination on December 27, 2019. (*Id.* at 344-48.)

On January 17, 2020 (now approximately eleven weeks post-vaccination), petitioner first sought treatment for left deltoid pain and some tingling in his hands. (Ex. 3, p. 349.) Estimating the duration of his pain as two to three months, he added that it "started after getting [a] flu shot." (*Id.* at 351.) He described the pain as radiating down his arm and "[o]nly occur[ing] when [he] lifts [his] arm or put[s] pressure [on it]." (*Id.*)

Upon examination, the PCP observed tenderness, but no redness or swelling. Petitioner had decreased range of motion of the left shoulder and positive empty can and Hawkins tests, though the Neer's test was negative. (Ex. 3, p. 354.) Assessing petitioner as having no acute injury and showing signs of arthritis, the PCP diagnosed petitioner with left deltoid pain and "[c]hronic left shoulder pain, likely rotator cuff tendonitis." (*Id.*) He ordered x-rays, prescribed oral steroids and medication for muscle spasms, and instructed petitioner to return if his "symptoms worsen[ed] or fail[ed] to improve." (*Id.*) Taken that same day, the x-ray results were normal except for narrowing and sclerosis[10] of the acromioclavicular and glenohumeral joints. (*Id.* at 356.)

On March 6, 2020, petitioner was seen by an orthopedist for left arm pain that started on October 31, 2019, and was located "right at the inj[ection] site (flu inj)." (Ex. 3, p. 358.) He reported that the pain was unchanged; was recently intermittent (waxing and waning); was aggravated by reaching, when sleeping, and with overhead activities; and was alleviated by rest. (*Id.* at 360.) Under the heading for "Injury" is listed the word "No," with the added description, "[s]eemed to start after flu immunization." (*Id.*) It was noted that petitioner had obtained some relief from the prescribed medication. (*Id.*)

After reviewing the x-rays taken in January, the orthopedist questioned whether petitioner's pain could be linked to his vaccination, and whether it was due to bursitis vs. tendinopathy. (Ex. 3, p. 364.) He diagnosed petitioner with chronic left shoulder pain and administered a steroid injection. (*Id.* at 364, 366.)

---

[9] There is also a separate consent form signed by both the administering nurse and petitioner. However, it does not have a separate prompt to identify the injection site. (Ex. 3, p. 323.)

[10] Sclerosis is "an induration or hardening, such as hardening of a part from inflammation, increased formation of connective tissue, or disease of the interstitial substance." *Sclerosis*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=45030 (last visited Aug. 3, 2026).

When seeking treatment for ear pain from his PCP on May 4, 2020, petitioner also asked about the next step regarding his chronic left shoulder pain and limited range of motion. (Ex. 3, p. 375.) He was instructed to contact his orthopedist. (*Id.* at 377.)

Approximately three weeks later, on May 29, 2020, petitioner visited the orthopedist again, now complaining of left shoulder pain that was "increasing a bit recently." (Ex. 3, p. 381.) Noting that petitioner had "failed conservative treatment thus far," an MRI was ordered. (*Id.* at 382, 384.) After reviewing the results of the MRI, performed on June 5, 2020, the orthopedist opined that petitioner "essentially ha[d] a normal shoulder MRI[, t]here is some evidence for mild bursitis which the injection should have take[n] care of[, and] [t]he possible mild tendonitis noted is not where his pain is." (*Id.* at 382-83.) He suggested petitioner should consider physical therapy ("PT"). (*Id.* at 383.)

When a nurse discussed the MRI results with petitioner on June 10, 2020, petitioner "verbalized that he need[ed] to get his results and get a second opinion because there's no way his upper arm [wa]s normal." (Ex. 3, p. 383.) He adamantly reiterated his belief that the flu shot caused his pain, adding that the vaccine "was given in the wrong place." (*Id.*) The nurse offered to schedule a follow-up visit if petitioner wished to discuss the normal MRI results further. (*Id.*)

On June 24, 2020, petitioner visited a second orthopedist and complained of left shoulder pain at a level of five out of ten for eight months. (Ex. 3, p. 398.) He attributed his shoulder pain to the flu vaccine he received on October 31, 2019, adding that he was "certain it was [administered in] his left arm." (*Id.*) Petitioner reported that he had obtained no pain relief from the prescribed oral steroids and previously administered subacromial injection. (*Id.*)

Upon examination, Dr. Shah observed normal range of motion and strength in both shoulders, no tenderness or swelling, but a positive Hawkins sign and limited cervical range of motion. (Ex. 3, p. 401.) After discussing his findings – including the results of petitioner's prior x-rays and MRI (again noted to be normal), Dr. Shah discussed both surgical and non-surgical treatment options. Petitioner opted for continued conservative treatment – pain medication, PT, and activity modification. (*Id.*)

Approximately one week later, on July 2, 2020, petitioner attended his first PT session. (Ex. 5, pp. 4-6.) He again described left shoulder pain that "started when he got a flu shot in Oct 2019." (*Id.* at 4.) At this visit, petitioner added that, after his MRI, he was seen by his "orthopedist who noted 'fluid in the bursae' and referred [him] to physical therapy." (*Id.*) Reporting a current pain level of two (with a maximum of eight), petitioner exhibited limited ROM. (*Id.*) He was instructed to attend PT twice weekly for four weeks. (*Id.* at 6.)

Throughout July 2020, petitioner attended a total of four PT sessions. (Ex. 5, pp. 4-16.) Although it appears he did not attend any further sessions, petitioner was not discharged from PT until more than a year later, on August 18, 2021. On the discharge

sheet, it was noted that petitioner had experienced increased pain for the last week, but he reported improvements in ROM. (*Id.* at 18.) His pain levels were recorded as a current pain level of two (with a maximum of seven). (*Id.* at 17.)

On July 24, 2020, petitioner visited his PCP for follow-up of his labs and diabetes. (Ex. 3, pp. 405-06.) Regarding his chronic left shoulder pain, he reported that his "[s]ymptoms had greatly improved but seem[ed] to have worsened again (paradoxically) with PT." (*Id.* at 406.)

On November 10, 2020, petitioner underwent EMG testing that revealed ulnar neuropathy of the left upper extremity. (Ex. 3, p. 433.) In an entry dated November 19, 2020, the orthopedist opined that this condition was "not the cause" of petitioner's shoulder pain but could cause "numbness of the 'funny bone' nerve in the future." (*Id.* at 435.) He suggested that petitioner follow-up with his orthopedist and consider another steroid injection. When a nurse informed petitioner of these test results, he expressed a desire to undergo another MRI with contrast, as suggested by family and friends, and stated he would contact his current orthopedist to schedule an appointment. (*Id.*) There is no entry regarding any further treatment with any other orthopedist.

b. <u>Affidavit and Written Statements</u>

On December 30, 2020, petitioner executed the affidavit that he filed, along with the petition, on January 12, 2021. (Ex. 1.) In this affidavit, petitioner recalled that, "[o]n or around October 31, 2019, I visited Dr. Oliver C. Wu, who administered the flu vaccine in my left shoulder at Kelsey Seybold Clear Lake." (*Id.* ¶ 2.) He further stated that "[i]mmediately upon receiving the injection, I felt a sharp pain and noticed swelling in my left arm." (*Id.* ¶ 3.) He insisted that he called his PCP's office, asking if this reaction was normal, and the nurse suggested that he make an appointment to be evaluated. Petitioner explained that he "did not immediately make an appointment with [his PCP] because [he] assumed the pain would eventually subside." (*Id.*)

In his supplemental written statement, petitioner further stated that "[t]he vaccine was administered in my left shoulder. I am absolutely certain about this fact." (Ex. 9, ¶ 3.) He explained:

> Throughout my entire adult life, including my career as a police officer, which began when I was 20 years old, I have consistently received vaccinations in my left shoulder. The reason I always choose to receive vaccinations in my left shoulder is to maintain full mobility and functionality in my right arm. As a police officer, I need to ensure my dominant arm (right arm) is unaffected in case of situations requiring quick action or the potential use of force. This practice of receiving vaccinations in my left arm has been consistent for approximately 30 years, including the flu vaccine I received on October 31, 2019.

(*Id.* ¶¶ 4-6.)

On November 21, 2022, petitioner provided a statement from a friend signed approximately one month earlier, on October 26, 2022. (Ex. 6.) Stating that she initially met petitioner as his hairstylist more than five years ago, the friend recalled petitioner asking whether she was getting a flu shot in October 2019, to which she responded in the negative. (*Id.* ¶¶ 3-4.) When she next saw petitioner, the friend recalled he complained of left arm pain and expressed a lack of knowledge regarding its cause. (*Id.* ¶ 5; Ex. 10, ¶ 3.) She stated,

> The next time I saw [petitioner], he complained about his arm hurting. At the time, he didn't know what could have been causing his arm pain, but [petitioner] said, "the pain is so bad I think I may have had a stroke."

(Ex. 6, ¶ 5.) When his pain did not improve, the friend recalled petitioner theorizing that the flu vaccine was "the only thing" he thought could have caused it. (*Id.* ¶ 6.) The friend insisted that she "remember[ed] these conversations vividly because [petitioner] usually keeps to himself and never complains." (*Id.* ¶ 7.) A subsequently filed statement reiterated that petitioner had complained of new left shoulder pain. (Ex. 10.)

## IV. Arguments in Show Cause Response

Petitioner's show cause response discussed a number of points beyond the question of injection situs, ultimately arguing that petitioner has satisfied all the requirements necessary to demonstrate a Table SIRVA. (ECF No. 35.) Pertinent to the question of the injection situs, petitioner argues the following:

- The assumption that vaccine administration records are sometimes automatically populated with default information should be viewed as "potentially applicable" to petitioner's records from Kelsey Seybold. (ECF No. 35, pp. 7-8.)

- It would be an unsupported assumption to conclude that a vaccine administration record would be more likely to incorrectly document a left-side administration as compared to a right-side administration. (ECF No. 35, p. 8 (disputing the relevance of *Mezzacapo v. Sec'y of Health & Human Servs*., No. 18-1977V, 2021 WL 1940435 (Fed. Cl. Spec. Mstr. Apr. 19, 2021)).)

- "[A]ll other contempora[neous] treatment records stand in opposition of the vaccination record and in support of Petitioner's claim." (ECF No. 35, p. 8.)

- Other cases support the unreliability of digital vaccine records with respect to injection site. (ECF No. 35, pp. 8-10 (citing *Kosma v. Sec'y of Health &*

*Human Servs.*, No. 21-0538V, 2023 WL 4843301 (Fed. Cl. Spec. Mstr. June 28, 2023); *Dixon v. Sec'y of Health & Human Servs.*, No. 20-1755V, 2024 WL 3495259 (Fed. Cl. Spec. Mstr. June 20, 2024); *Kienow v. Sec'y of Health & Human Servs.*, No. 21-630V, 2024 WL 2852333 (Fed. Cl. Spec. Mstr. May 1, 2024).

- "[P]reponderant evidence, such as medical documentation of right-arm pain, coupled with the petitioner's witness statement, can overcome the presumption of accuracy in digital vaccine records." (ECF No. 35, p. 10 (citing *Dixon*, 2024 WL 3495259; *Kienow*, 2024 WL 2852333).) In this case, petitioner's medical treatment records and the available witness statements should be credited. (*Id.*)

## V. Legal Standard for Fact Finding

Pursuant to § 300aa-13(a)(1), a petitioner must prove the factual underpinnings of their claim by a preponderance of the evidence. That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (alterations in original) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).

A special master must consider the entire record, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury. § 300aa-13(b)(1). However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Thus, medical records that are clear, consistent, and complete should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule is not absolute. Afterall, "[m]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). In *Lowrie*, the special master wrote that "[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." 2005 WL 6117475, at *19 (quoting *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992)). Importantly, however, "the absence of a reference to a condition or circumstance is much less significant than a reference which

negates the existence of the condition or circumstance." *Murphy*, 23 Cl. Ct. at 733 (quoting the decision below).

When witness testimony is offered to overcome the weight afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Further, the special master must consider the credibility of the individual offering the testimony. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that the decision was the result of a rational determination. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 416-17 (Fed. Cir. 1993). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 300aa-12(d)(3); Vaccine Rule 8), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

The factual question of injection site does arise repeatedly in the context of SIRVA. In that context:

> it is important that special masters recognize that vaccine administration records can sometimes be incorrect and that they should not be accepted reflexively. However, that is a far cry from presuming they are to be distrusted generally or without good reason. Vaccine administration records are still, after all, contemporaneous medical records.

*Anderson v. Sec'y of Health & Human Servs.*, No. 20-195V, 2023 WL 2237320, at *10 (Fed. Cl. Spec. Mstr. Feb. 2, 2023).

Nonetheless, "treatment records are [also] probative on this issue because they are contemporaneous documents recorded by disinterested persons memorializing the fact that petitioner at that time understood her vaccination to have been administered in her [affected] shoulder, believed that to be relevant to assessing her condition, and sought treatment accordingly." *Hanna v. Sec'y of Health & Human Servs.*, No. 18-1455V, 2021 WL 3486248, at *9 (Fed. Cl. Spec. Mstr. July 15, 2021); *see also Mezzacapo*, 2021 WL 1940435, at *7. Thus, there is an established track record of prior cases in which vaccine injection site has been considered based on the totality of the evidence, even where the administration record itself conflicts with petitioner's allegation. *See, e.g.*, *Christensen v. Sec'y of Health & Human Servs.*, No. 19-0007V, 2022 WL 1020386 (Fed. Cl. Spec. Mstr. Feb. 28, 2022); *Syed v. Sec'y of Health & Human Servs.*, No. 19-1364V, 2021 WL 2229829 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Irwin v. Sec'y of Health & Human Servs.*, No. 19-956V, 2021 WL 5504701 (Fed. Cl. Spec. Mstr. Oct. 18, 2021); *Baker v. Sec'y of Health & Human Servs.*, No. 19-1771V,

2020 WL 6580192 (Fed. Cl. Spec. Mstr. Oct. 9, 2020); *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021).

Importantly, however, while subsequent treatment records can provide some evidence as to the injection site, patient histories in later medical records that conflict with contemporaneous records will generally be afforded less weight. *See, e.g.*, *R.K. ex rel. A.K. v. Sec'y of Health & Human Servs*., No. 03-0632V, 2015 WL 10936124, at *76 (Fed. Cl. Spec. Mstr. Sep. 28, 2015) (holding that more remote histories of illness do not have sufficient indicia of reliability to be credited over conflicting contemporaneous medical records and earlier reported histories), *mot. for rev. denied*, 125 Fed. Cl. 57 (2016), *aff'd per curiam*, 671 F. App'x 792 (Fed. Cir. 2016); *see also, e.g.*, *Vergara v. Sec'y of Health & Human Servs.*, No. 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recounted in later medical histories*, affidavits, or trial testimony." (emphasis added)).

## VI. Discussion

### a. The vaccination record is entitled to significant weight

There is no question that the most contemporaneous evidence of the site of injection of petitioner's flu vaccine is the vaccine administration record created by petitioner's primary care provider. (Ex. 2.) Accordingly, it should be afforded significant weight if it appears to be reliable.[11] *See Hanna*, 2021 WL 3486248, at *7. To that point, petitioner has not identified any errors or omissions (apart from the notation that is itself at issue) that would call the practice's recordkeeping into question. Moreover, the undersigned's review of the primary care provider's overall body of records does not suggest any obvious reason to doubt the general reliability of the practice's recordkeeping. This is in contrast to many of the cases that have litigated electronic administration records from chain pharmacies where recordkeeping practices have been repeatedly called into question. *E.g.*, *Mezzacapo*, 2021 WL 1940435, at *6 (the undersigned noting that "experience litigating SIRVA claims has shown that pharmacy vaccine administration records are not necessarily reliable in documenting injection site"); *Stoliker v. Sec'y of Health & Human Servs*., No. 17-990V, 2018 WL 6718629, at *3-4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018). Moreover, it is notable that the record at issue

[11] This is not merely a truism. It is not a given that vaccine administration records from medical providers will appear facially reliable. For example, in *Walker*, the petitioner was persuasive in arguing that her vaccination record fell short of being "strong, unequivocal" evidence of injection site. *Walker v. Sec'y of Health & Human Servs.*, No. 21-1325V, 2024 WL 1517362, at *7 (Fed. Cl. Spec. Mstr. Mar. 13, 2024). In that case, the petitioner observed that the vaccination record contained "at least one facially obvious error as well as other errors suspicious for unreliable recordkeeping." *Id.* Specifically, the administration record indicated that the flu vaccine at issue had been ordered two weeks after it was administered. *Id.* Additionally, issues with respect to the timestamp and expiration date were further suggestive of unreliable recordkeeping. *Id.* While "the identification of some errors does not lead invariably to the conclusion that other details were likewise incorrectly recorded," the presence of the errors "call[ed] into question the attention to detail of the person that created the record" and thus the record's reliability as a whole. *Id.*

in this case contradicts petitioner's claim, rather than merely being silent. *Murphy*, 23 Cl. Ct. at 733.

I have considered the prior cases that call electronic vaccine administration records into question, including those cited by petitioner, but the specific record at issue in this case does not appear susceptible to the same concerns as often described in those decisions. In particular, the administration record at issue in this case confirms that the administration occurred at 12:24 p.m. and that the record was then edited by the vaccine administrator at 12:26 p.m. (Ex. 3, p. 322.) Though not definitive, these time stamps offer a strong indication that the resulting record notation was created in full appreciation of the fact that petitioner had actually been vaccinated in the documented shoulder.

I have also considered that petitioner has submitted an affidavit and a written statement averring that his vaccine was administered in the opposite shoulder. However, there are several reasons why these statements do not outweigh the contemporaneous record. First, petitioner provides no specific recollection or description of the circumstances surrounding his vaccination, making it difficult to assess the extent of his actual recollection of events. (Ex. 1, ¶ 2; Ex. 9, ¶ 3.) Second, the one detail petitioner did provide regarding his vaccination is incorrect. Whereas petitioner's affidavit clearly states that it was Dr. Wu who administered his vaccination (Ex. 1, ¶ 2), the vaccine administration record indicates that the vaccine was administered by Rebecah Sklenarik. (Ex. 3, p. 322.) Moreover, this is confirmed by the accompanying consent form that was signed by both nurse Sklenarik and petitioner. (*Id*. at 323.) Third, as explained in his second written statement, petitioner's assertion that he was vaccinated in his left, rather than right, arm appears to be based on what he considers to be his habit and practice, rather than a specific recollection of the occurrence of this vaccination. (Ex. 9, ¶¶ 4-6.) While this type of information can be supportive, petitioner's statement in this case overstates the consistency with which he has received vaccinations only in his left arm. Petitioner's medical records document, for example, that on October 4, 2016, petitioner received flu and hepatis vaccinations, bilaterally. (Ex. 3, p. 4.)

**b. Petitioner's subsequent treatment records are not entitled to greater weight than the contemporaneously created vaccination record**

Petitioner argues that apart from the vaccination record, all of the medical records submitted in this case support petitioner's contention that he received his flu vaccine in his left shoulder. (ECF No. 35, p. 10.) Subsequent treatment records can be important evidence regarding the injection site of a vaccination. *E.g.*, *Hanna*, 2021 WL 3486248, at *9; *Mezzacapo*, 2021 WL 1940435, at *7; *see also Walker*, 2024 WL 1517362, at *6. However, longstanding Vaccine Program understanding counsels that later patient histories generally garner less weight than more contemporaneous records. *See, e.g.*, *R.K.*, 2015 WL 10936124, at *76; *Vergara*, 2014 WL 2795491, at *4.

In this case, petitioner waited approximately eleven weeks before seeking treatment for his condition. (Ex. 3, p. 349.) In and of itself, this is not necessarily an unusual pattern of treatment and would not defeat a SIRVA claim. Afterall, "there is no such thing as an 'appropriate' time to seek treatment." *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020). However, treatment records are probative as to injection site, not because they constitute documentation of the vaccine administration, but because they memorialize the petitioner's understanding of the nature of the injury at the time of treatment. *Hanna*, 2021 WL 3486248, at *9. Thus, the longer the time between vaccination and treatment, the greater the chance of reporting an incorrect history. While not dispositive, petitioner's delay in seeking treatment is a consideration in balancing the record as a whole, especially because petitioner is seeking to rely on later treatment records to overcome a contemporaneously created administration record that explicitly contradicts his claim. *Murphy*, 23 Cl. Ct. at 733.

Additionally, although petitioner's treatment records were consistent in documenting that he attributed his shoulder pain to his vaccination, the witness statement filed by petitioner casts significant doubt on the confidence of that attribution. Petitioner averred that, "[i]mmediately upon receiving the injection, I felt a sharp pain and noticed swelling in my left arm. The pain was so severe I was unable to lift my left arm." (Ex 1, ¶ 3.) However, his fact witness stated that when petitioner first complained of arm pain, he stated that "he didn't know what could have been causing his arm pain." (Ex. 6, ¶ 5.) It was only later, during a subsequent encounter, that she recalled petitioner stating that "the only thing I can think that caused it was the vaccine." (*Id*. ¶ 6.) This description of events from a disinterested witness strongly suggests that, in contrast to the immediate sharp pain petitioner averred he experienced at the actual time of injection, petitioner only belatedly came to associate his shoulder pain to his vaccination.[12] That is, if petitioner's injection itself had been as notably painful as he averred, it is difficult to accept that he would have at any point been confused as to the cause of his pain. Especially given that he did not begin to treat his shoulder pain until eleven weeks post-vaccination, this casts doubt on the history provided to his medical providers, making it more difficult to credit the later treatment record in preference to the contemporaneous administration record, which is clear and consistent in itself.

On the whole, petitioner's post-vaccination treatment records are entitled to some evidentiary weight. However, for the reasons discussed above, they do not outweigh the contemporaneously created vaccine administration record.

**c. Petitioner's written statements are not entitled to greater weight than the contemporaneously created vaccination record**

---

[12] Notably, the Chief Special Master had specifically noted in his order to show cause that this witness had "significantly undermine[d]" petitioner's position. (ECF No. 32, p. 7 (emphasis omitted).) Petitioner then filed a second statement by the same witness in response to the show cause order. (Ex. 10.) However, that second statement is entirely consistent with the first statement and includes no additional recollection or assertion that would suggest the Chief Special Master's initial interpretation of the original statement was incorrect.

Contemporaneous records prepared independently of litigation are often more reliable than testimony of interested parties. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993) (discussing the "widely held belief that written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *see also Rogero v. Sec'y of Health & Human Servs.*, 748 F. App'x 996, 1001 (Fed. Cir. 2018) (noting that "it is a familiar and reasonable assessment that contemporaneous documentary evidence . . . prepared by professionals doing their jobs independently of litigation[] can be (though is not necessarily) more reliable than testimony of interested parties"). To overcome the weight afforded to contemporaneous medical records, testimony must be "consistent, clear, cogent and compelling." *Camery*, 42 Fed. Cl. at 391. For example, in *Anderson*, the petitioner purported to recall receiving her vaccine in her right arm, she but failed to discuss the basis for that recollection or offer any specific recollection that would challenge the accuracy of the consent form or suggest that the consent form was completed with any error. *Anderson v. Sec'y of Health & Human Servs.*, No. 20-195V, 2022 WL 17484352, at *8 (Fed. Cl. Spec. Mstr. Nov. 10, 2022).

Here, as discussed in the preceding sections, petitioner (1) did not provide any meaningful narrative of the circumstances surrounding his vaccination; (2) mis-recalled who had administered the vaccination; (3) purported to provide evidence of his habit and practice that is not supported by his earlier medical records; and (4) described an immediate onset of sharp pain that is undermined by his fact witnesses recollection that he did not initially understand what caused his shoulder pain. Thus, although the written statements have been considered, they are insufficient to outweigh the contemporaneous vaccine administration records, either alone or in combination with the subsequent treatment records discussed in the preceding section.

As explained above, petitioner was specifically advised as of the issuance of the Chief Special Master's show cause order that the evidence of record at that time did not preponderate in favor of a finding that petitioner's vaccination had been administered in his affected shoulder. (ECF No. 32.) However, subsequent to that order, petitioner has only filed the two witness statements discussed above (Exhibits 9 and 10), which, though they have been considered, did not meaningfully change the balance of the record evidence. Moreover, although petitioner had initially requested a live hearing in response to the Chief's show cause order, after this case was subsequently reassigned and petitioner was directed to indicate how he proposed to develop the record, he advised that he wanted the show cause order resolved on the existing record. (ECF No. 38.)

## II. Conclusion

Petitioner has my sympathy for what he has endured. Nonetheless, based on all of the above, when considering the record as a whole, there is not preponderant evidence that petitioner's vaccination was administered in his left arm as alleged. Rather, the evidence preponderates in favor of a finding that petitioner's vaccination

was administered in his right deltoid. Further, petitioner cannot preponderantly establish that his October 31, 2019 flu vaccination, administered in his right arm, resulted in an injection-related injury affecting his opposite shoulder and arm, whether as a Table SIRVA or cause-in-fact claim. Accordingly, petitioner is not entitled to compensation and this case is dismissed.[13]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

[13] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.